**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| DELETTRIA WHITEHEAD, Individually, and as class representative for all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> J I FINANCIAL, LLC; GLOBAL CLIENT SOLUTIONS, LLC f/k/a CFG ACCEPTANCE, LLC; LUFTMAN HECK & ASSOCIATES, LLP, f/k/a FORNA, LUFTMAN & HECK, LLC; WILLIAM J. FORNIA; BENJAMIN LUFTMAN; JEREMIAH HECK; and UNKNOWN PARTIES A, B, C, and D whose real and proper identities are unknown at present, <br><br> Defendants. | CASE NO.: CV410-262 |

**DEFENDANT GLOBAL CLIENT SOLUTIONS, LLC's MOTION TO DISMISS WITH**
**INCORPORATED MEMORANDUM OF LAW**

Pursuant to L.R. 7.1 and Fed. R. Civ. P. 12(b)(6), Defendant Global Client Solutions, LLC ("Global") respectfully moves this honorable Court to dismiss this Action.[1] Plaintiff fails to state a plausible claim for at least four (4) separate and independent reasons, which are discussed more fully below.

First, and as a threshold matter, Plaintiff Delettria Whitehead ("Plaintiff" or "Whitehead") entered into a valid and enforceable agreement with Global, which contains an arbitration provision. Both the Federal Arbitration Act and Georgia law require Plaintiff to arbitrate her claims.

Second, the Georgia Debt Adjustment Act, O.C.G.A. § 18-5-1, *et seq*. ("GDAA") exempts entities such as Global that are subject to oversight by the Federal Deposit Insurance

---

1.      By filing this motion to dismiss and supporting memorandum of law, Global does not waive the argument that this matter must be compelled to arbitration under the Federal Arbitration Act, as argued in the motion to compel arbitration contemporaneously filed in this matter.

Corporation ("FDIC"), the Office of Thrift Supervision ("OTS") or the Office of the Comptroller of the Currency ("OCC"). Each of these regulators oversee Global. Additionally, the GDAA exempts those entities like Global who "incidentally engage[] in debt adjustment".

Third, by statutory definition, Global is not "doing business" in adjusting debts. For one thing, Global does not "effect the adjustment" of the debtor's indebtedness; it simply processes bank account transactions at the account holder's directions. For another, Global does not "disburse" funds to a debtor's creditors; rather, by agreement Global simply processes transfers according to the account holder's instructions.

Fourth, even if Global is not exempt from the GDAA or is thought to be doing business in debt adjusting, Plaintiff fails to state a plausible claim against Global for violations of OCGA § 18-5-2, OCGA § 18-5-3.2(a) and OCGA § 18-5-3.2(b). As to the purported OCGA § 18-5-2 violation, Plaintiff fails to allege Global collected any debt adjusting fees; similarly, the alleged OCGA § 18-5-3.2(a) violation predicated on a generic allegation that the "Defendants" failed to disburse funds within 30 days fails since Global only had authority to disburse funds at Plaintiff's direction; and the alleged OCGA § 18-5-3.2(b) violation is nothing more than a bare conclusion masquerading as fact.

Finally, to the extent the Court applies the GDAA, as Plaintiff urges, to a bank agent processing transfers of funds to and from a customer's bank account, the statute is unconstitutional. Any such application would violate the contract clause, the commerce clause, and the Equal Protection and Due Process provisions of the Fifth and Fourteenth Amendments, and provisions of the State Constitution.

## MEMORANDUM OF LAW

### I.    PREFACE

On September 22, 2010, Plaintiff filed this lawsuit against at least ten separate defendants:  J I Financial, LLC ("JIF"), Luftman Heck & Associates, LLP f/k/a Fornia, Luftman & Heck, LLC ("LHA"), William J. Fornia, Benjamin Luftman, Jeremiah Heck, Unknown Parties A, B, C, and D whose real and proper identities are unknown at present (collectively, "Debt Settlement Defendants") and Global in the Superior Court of Toombs County, Georgia.[2]

Plaintiff seeks to certify three (3) classes of Georgia residents, one for each of the first three (3) counts. More specifically, in Count I, Plaintiff seeks to certify a class of those customers from whom Defendants allegedly collected fees in violation of OCGA § 18-5-2[3]; in Count II, Plaintiff seeks to certify a class of customers for whom Defendants allegedly failed to disburse customer funds to their respective creditors within the proscribed time limits of OCGA § 18-5-3.2(a)[4]; and in Count III, Plaintiff seeks to certify a class of those customers for whom Defendants allegedly did not maintain separate trust accounts for in violation of OCGA § 18-5-3.2(b).[5]  Plaintiff likewise seeks injunctive relief as well pursuant to OCGA § 9-11-23(b)(2).[6]

On November 3, 2010, Global timely removed this action to this Court.[7] Shortly thereafter, on November 18, 2010, Plaintiff filed a Notice of Dismissal of her claims without prejudice as to Defendants William J. Fornia and Benjamin Luftman.[8]

---

2.    [Doc. 1, Ex. 3.].
3.    [Doc. 1-3 ¶¶ 92-103.].
4.    [Doc. 1-3 ¶¶ 104-113.].
5.    [Doc. 1-3 ¶¶ 114-123.].
6.    [Doc. 1-3 ¶ 124.].
7.    [Doc. 1.].
8.    [Doc. 13.].

## II.    BACKGROUND

To determine the matters raised in this Motion, the Court must consider the context in which the alleged claims arise. That context is best understood by (A) considering the background of the case and who the parties are, (B) assessing what is alleged in the Complaint, (C) considering how Plaintiff's relationship is defined by a written contract with Global, and (D) evaluating the matters alleged in the context of the Federal Trade Commission's, Telemarketing Sales Rules, each of which is discussed in turn.[9]

### A.    The Parties

#### 1.    Plaintiff

Plaintiff alleges that she is a domiciliary of Georgia and Toombs County.[10]

#### 2.    Global

Global is an Oklahoma limited liability company.[11] Global processes bank account transfers and provides account management services.[12] Specifically, GLOBAL provides Automated Clearing House ("ACH") services for account holders, such as Plaintiff in this case. ACH transactions involve an electronic funds transfer between originating and receiving financial institutions, acting on the account holder's payment instructions to either debit or credit from the account holder's account.[13]

---

9.     On July 29, 2010, the FTC amended the Telemarketing Sales Rule to include debt settlement companies. Those amendments, as manifested in the Final Rule, find acceptable and codify the very type of bank account and account administration Plaintiff here is attempting to claim is unlawful debt adjusting. *See, e.g., Telemarketing Sales Rule Debt Relief Rule Fact Sheet – 7/28/10* at http://www.ftc.gov/os/2010/07/100729tsrfactsheet.pdf.

10.     [Doc. 1-3 ¶ 16.].

11.     [Doc. 1-3 ¶ 22.]; *See* Hampton Decl. at ¶ 2.

12.     *See* Hampton Decl. at ¶ 3; [Doc. 1-3, *see, e.g.,* ¶¶ 73 & 83.].

13.     *See* Hampton Decl. at ¶¶ 7 & 8.

### 3.   The Other Defendants

Plaintiff alleges that JIF was a foreign limited liability company incorporated in Ohio which was dissolved on or before June 15, 2004.[14] Plaintiff alleges that LHA is a law firm and Ohio corporation doing business in Georgia.[15] Jeremiah Heck, according to Plaintiff, is an attorney licensed to practice in Ohio doing business as LHA.[16]

### B.   <u>Matters Alleged in the Complaint</u>[17]

Plaintiff alleges she initially contracted with JIF to provide her certain debt settlement services in October of 2003.[18] At sometime before June 1, 2004, Plaintiff asserts that her debt services agreement was transferred to LHA.[19] Plaintiff alleges she received a letter from LHA, which enclosed a schedule of Global's fees related to the Account ("Fee Schedule").[20]

Thereafter, Plaintiff claims Global charged her a $5.00 "set-up" fee for her Account and then monthly maintenance fees totaling $7.50 per month from September 2004 to November of 2006.[21] Plaintiff further alleges Global charged her $0.15 per electronic transfer attempt,[22] and

---

14.      [Doc. 1-3 ¶¶ 17 & 21.].
15.      [Doc. 1-3 ¶ 28.].
16.      [Doc. 1-3 ¶ 52.].
17.      Although Global attempts in this discussion to summarize the Complaint, nothing herein is intended to be either an admission that the Complaint satisfies the Federal Rules of Civil Procedure or that any of the allegations are true.
18.      [Doc. 1-3 ¶ 68.].
19.      [Doc. 1-3 ¶ 73.].
20.      [Doc. 1-3 ¶ 74.]. Conspicuously, the agreement between Plaintiff and Global is not attached to the Complaint. The agreement totally undermines the claims being asserted against Global. Because the agreement with Global is alleged in the Complaint *See, e.g.* [Doc. 1-3 ¶ 114.] ("Plaintiff was required by the Contract with Defendants to set up and maintain her own trust account…") and because it is central to Plaintiff's claim and the contents are not in dispute, this Court may consider the agreement in deciding the matters raised by this Motion. *See Fin. Sec. Assur., Inc. v. Stephens, Inc.,* 500 F.3d 1276, 1284 (11th Cir.2007) (Commenting on a defendant's ability to attach documents to a motion to dismiss, the court stated it: "…recognizes an exception, however, in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss."). Global, therefore, under separate filings provides the account application and account agreement for Plaintiff's Account which underlie her claims. *See* Brett Hampton's Declaration at ¶ 4; Ex. 1 & 2.
21.      [Doc. 1-3 ¶ 75.].

$9.00 in fees for three separate wire transfers to Capital One,[23] a creditor of Plaintiff for which LHA facilitated the settlement of that respective debt.[24]

After Plaintiff terminated the "Agreement with Defendants"[25] on or about February 15, 2007,[26] Plaintiff alleges she received a refund check of $602.25 on or about February 27, 2007 and another totaling $603.00 on or about June 4, 2010 from Global.[27]

### C.   **The Colorado Bank Account**

#### 1.   **The Account Application.**

On July 26, 2004, Plaintiff signed a Special Purpose Account Application (the, "Account Application") to open a bank account at Rocky Mountain Bank and Trust ("RMBT").[28] The account agreement and disclosure statement used at this particular time (the, "Account Agreement") is attached as Exhibit B to Hampton's Declaration filed in support of this motion.[29] Once opened, as the Account Agreement explains, Global would administer the Account.[30] The Account Application Plaintiff signed provides, in pertinent part, that:

SPECIAL PURPOSE ACCOUNT APPLICATION

I hereby apply for and establish a special purpose account (the "Account") with Rocky Mountain Bank & Trust of Colorado Springs, Colorado ("Bank") for the purpose of creating an effective and disciplined approach to fulfilling my

---

22.     [Doc. 1-3 ¶ 76.].
23.     [Doc. 1-3 ¶ 79.].
24.     [Doc. 1-3 ¶ 78.].
25.     Plaintiff fails to make separate allegations about the respective Defendants, electing instead to lump all Defendant's together, without differentiation. [*See, e.g.,* Doc. 1-3 ¶¶ 71, 72, 78, 80, 93, 94, 96-98, 105-108 & 115-117.]. As the Eleventh Circuit Court of Appeals has made so poignantly clear, "in a case with multiple defendants, the complaint should contain specific allegations with respect to each defendant; generalized allegations lumping multiple defendants together are insufficient." *West Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 Fed.Appx. 81, 86 (11th Cir. 2008) (citations omitted).
26.     [Doc. 1-3 ¶ 80.].
27.     [Doc. 1-3 ¶¶ 81 & 82.].
28.     At the time Plaintiff opened her account at RMBT, account holders received an account application and account agreement from the debt settlement company such as LHA. *See* Hampton Dec. at ¶ 4; Ex. 1 & 2.
29.     *See* Hampton Dec. at ¶ 4; Ex. 2.
30.     *See* Hampton Dec. at ¶ 4; Ex. 2.

obligations under a debt management program (the "Program") sponsored by the organization identified below (the "Sponsor"). *I understand that the Accounts features, terms, conditions and rules are further described in an Account Agreement and Disclosure Statement that accompanies this Application (the "Agreement"). I acknowledge that I have received a copy of the Agreement; that I have read and understand it; that the Agreement is fully incorporated into this Application by reference; and that I am bound by all of its terms and conditions.*

* * *

I understand that the Account, when established in accordance with this Application, will be my sole and exclusive property: *that only I may authorize deposits to and disbursements from the Account*; and that I may withdraw funds from and/or close the Account at any time as provided for in the Agreement.

* * *

The authorization shall remain in full force and effect until I give a written termination notice to Global that affords it a reasonable period of time to act on it. Any such notice, and any other written notice that is provided for in this Application or the Agreement, shall be sent to the Customer Service Center at the address . . . .[31]

Plaintiff used the Account from August 2004 through February 2007.[32] Each month after she established and used her account, Global mailed to Plaintiff at the address she provided, by first class mail and proper postage, a paper statement.[33] The paper statement detailed all of the account activity, which she authorized during each particular calendar month.[34]

## 2.   The Account Agreement.

The Account Agreement alleged in the Complaint and received by the Plaintiff as part of the Account Application, provides, in part, that:

This Account Agreement and Disclosure Statement (this "Agreement") is between Rocky Mountain Bank & Trust, 755 Cheyenne Meadows, Colorado Springs, CO 80906 (the "Bank"), and you.

* * *

**Purpose and Use of the Account:** Your may authorize us, or others on your behalf, to automatically debit or credit your account by means of automatic transfer. You may also give instructions to us through the use of your debt management program and others; and we shall be entitled to rely on those instructions . . . .

---

31.     *See* Hampton Dec. at Ex. 1.
32.     *See* Hampton Dec. at ¶ 6.
33.     *See* Hampton Dec. at ¶ 6.
34.     *See* Hampton Dec. at ¶ 6.

* * *

**Expiration of Agreement:** You may terminate this Agreement and cancel your Account at any time . . . If either you or we terminate this Agreement, we will send you or check for the collected balance in your Account . . .

* * *

**Acknowledgment of Transactions:** A monthly statement showing your Account balance and transaction is available on the Internet. We will also mail you a statement if you request that we so . . . . You agree to inspect your statement and promptly notify us of any erroneous, improper or unauthorized transactions.

* * *

**FDIC Insurance:** The funds in your Account will be FDIC.

* * *

**Creditor Disputes:** You agree to settle all disputes about payments made to your creditors from your Account. We are simply providing your Account to help facilitate your plan to repay your debts. We are not a party to your debt management plan, and you acknowledge that we have no involvement in or responsibilities of any nature with respect to your plan or the results that you may or may not achieve from its execution.

* * *

**Arbitration and Application of Law:** In the event a dispute or claim relating in any way to this Agreement or our services, you agree that this dispute shall be resolved by a binding arbitration utilizing a qualified independent arbitrator of our choosing. Further, you agree that any arbitration shall take place in Colorado Springs, Colorado and that the law of Colorado shall apply. The decision of an arbitrator will be final and subject to enforcement in a court of competent jurisdiction.[35]

Furthermore, as set forth in the Account Agreement, Global facilitated an Automated Clearing House ("ACH") function for Plaintiff's Account held at RMBT.[36] ACH payments can either be credits, originated by the accountholder sending funds (payer), or debits, originated by the accountholder receiving funds (payee).[37] An ACH transaction is essentially an electronic

---

[35].   *See* Hampton Dec. at Ex. 2.
[36].   *See* Hampton Dec. at ¶ 7.
[37].   *See* Hampton Dec. at ¶ 7.

funds transfer between originating and receiving financial institutions.[38] ACH payments are used

in a variety of payment environments.[39] Originally, consumers primarily used the ACH for

paycheck direct deposit.[40] Now, they increasingly use the ACH for bill payments (often referred

to as direct payments), corporate payments (business-to-business), and government payments

(*e.g.,* tax refunds).[41]

     Financial institutions such as RMBT may contract with third-party service providers –

such as Global – to conduct their ACH activities.[42] GLOBAL was the processor for all the

activity that related to the Account Plaintiff established at RMBT.[43]  Further, Global does not

conduct any negotiations for any RMBT account holder's creditors, as Plaintiff expressly

acknowledged in the Account Agreement, and did not do so for Plaintiff in this case.[44]

### D.  The FTC Rule

     The United States Federal Trade Commission ("FTC") issued its anticipated Final Rule

amending the Telemarketing Sales Rule ("TSR") to afford direction to those companies the FTC

defines as "debt relief companies".[45] The Final Rule imposes a federal scheme of regulation

upon "debt relief companies" providing "debt relief services", which are defined as:

> any program or service represented, directly or by implication, to renegotiate,
> settle, or in any way alter the terms of payment or other terms of the debt between
> a person and one or more unsecured creditors or debt collectors, including, but not

---

38.     *See* Hampton Dec. at ¶ 7.
39.     *See* Hampton Dec. at ¶ 7.
40.     *See* Hampton Dec. at ¶ 7.
41.     *See* Hampton Dec. at ¶ 7.
42.     *See* Hampton Dec. at ¶ 8.
43.     *See* Hampton Dec. at ¶ 8.
44.     *See* Hampton Dec. at ¶ 9; Ex. 2.
45.     On July 29, 2010, the FTC amended the TSR to include debt settlement companies. Those amendments, as manifested in the Final Rule, find acceptable and codify the very type of bank account and account administration provided by RMBT and Global, respectively, Plaintiff here claims is unlawful debt adjusting.

limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.[46]

The Final Rule makes clear that a bank processing agent such as Global, which simply provides account and attendant ACH and like services and none of the "debt relief services" the Final Rule defines, is ***not*** considered a "debt relief company".[47] The Final Rule acknowledges the obvious distinction between a "debt relief company" (a "debt adjuster" in Georgia), and an "intermediary" company, such as Global, that establishes and maintains a "dedicated bank account" for the customer which is legitimately utilized by the debt relief company for deposit and holding of both its fees and the monies to be eventually paid to the customer's creditors.[48]

This aspect of the Final Rule both codifies and legitimizes a practice of the debt relief industry that is assailed in this case: the collection of monies (and fees) in advance which are held in the special purpose account until the debt relief company has negotiated the settlement of an account. These now federally sanctioned practices seemingly conflict with and simply cannot be reconciled with the GDAA. The mechanics for this "dedicated bank account" are plainly set out in 16 CFR § 310.4(a)(5)(ii). Thus, the FTC has explicitly recognized that an intermediary such as Global is not and cannot be a debt relief company.

---

46.        16 CFR § 310.2(m).
47.        Specifically, there is a provision in the Final Rule that allows debt relief companies to require that consumers set aside their fees and savings for payment to creditors in a "dedicated account" – such as the RMBT "Special Purpose Account", which Global administered here – when (i) the dedicated account is maintained at an insured financial institution; (ii) the consumer owns the funds (including any interest accrued); (iii) the consumer can withdraw the funds at any time without penalty; (iv) the provider does not own or control or have any affiliation with the company administering the account; and (v) the provider does not exchange any referral fees with the company administering the account, the precise attributes of the account Plaintiff (and each member of the putative class) opened with RMBT and which Global administered. *See Telemarketing Sales Rule Debt Relief Rule Fact Sheet – 7/28/10* at http://www.ftc.gov/os/2010/07/100729tsrfactsheet.pdf
48.        16 CFR § 310.4(a)(5)(ii).

III.   **ARGUMENT**

A.   **APPLICABLE LEGAL STANDARD.**

Although Rule 12(b)(6) allows "a well-pleaded complaint [to] proceed even if it strikes a savvy judge that actual proof of those facts is improbable," the "[f]actual allegations must be enough to raise a right to relief above the speculative level."[49] As the Supreme Court explained in *Twombly*, "a formulaic recitation of the elements of a cause of action will not do."[50]  A complaint must contain "enough factual matter (taken as true) to suggest" the required element.[51] The rule "does not impose a probability requirement at the pleading stage," but "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element.[52] Yet, to survive a motion to dismiss, a complaint must at a bare minimum "[identify] facts that are suggestive enough to render [the element] plausible,"[53] "**plausible** on its face."[54]

"A claim has facial plausibility only when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[55]  In this regard, *Twombly* made explicitly clear that a district court is free to infer from the factual content in the complaint "obvious alternative explanations," which suggest lawful conduct rather than the unlawful misconduct the plaintiff would ask the court to infer.[56] Thus,

---

49.   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964-65 (2007).
50.   *Twombly,* 127 S.Ct. at 1964-65.
51.   *Twombly,* 127 S.Ct. at 1965.
52.   *Twombly,* 127 S.Ct. at 1965.
53.   *Twombly,* 127 S.Ct. at 1965.
54.   *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quotations and citations omitted); (emphasis added).
55.   *Iqbal*, 129 S.Ct. at 1949.
56.   *Twombly*, 127 S.Ct. at 1972-74 (The Court found that plaintiffs' complaint did not plausibly suggest an illegal conspiracy by merely alleging parallel conduct-because such parallel conduct was more likely explained by lawful, independent market behavior and so the Court held that the district court properly dismissed the complaint.).

under *Twombly* the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"[57] masquerading as factual allegations.

### B. PLAINTIFF AND GLOBAL AGREED TO ARBITRATE ALL DISPUTES BETWEEN THEM, THEREFORE, THIS ACTION MUST BE COMPELLED TO ARBITRATION AND DISMISSED

Plaintiff entered into the Account Agreement with Global which outlined the parties' respective duties and obligations in connection with the processing services Global provided. On July 26, 2004, Plaintiff received and signed the Account Application[58] and acknowledged the receipt of the Account Agreement.[59] The Account Agreement contains a clause mandating the arbitration of all claims.[60]

Because the Account Agreement is a contract "evidencing a transaction involving commerce," the Agreement to arbitrate is governed by the FAA.[61] Georgia courts acknowledge that the FAA establishes a 'federal policy favoring arbitration' and requires that courts 'rigorously enforce agreements to arbitrate.'[62] Moreover, because Plaintiff accepted Global's ACH services by paying for and receiving its benefits without any objection, she is also obligated to arbitrate under well established Georgia law that valid contracts, including contracts containing arbitration clauses, may be formed by a party's continued use or acceptance of services without objection.[63] The contract here involving commerce is valid and enforceable. As

---

57.    *Twombly,* 127 S.Ct. at 1949.
58.    *See* Hampton Dec. at Ex. 1.
59.    *See* Hampton Dec. at Ex. 1.
60.    *See* Hampton Dec. at Ex. 2. ("In the event a dispute or claim relating in any way to this Agreement or our services, you agree that this dispute shall be resolved by a binding arbitration…").
61.    *See* 9 U.S.C. § 2.
62.    *Honig v. Comcast of Georgia I, LLC,* 537 F.Supp.2d 1277, 1282 (N.D. Ga. 2008) (citations omitted).
63.    *Id.* at 1283-84; *See, e.g., Comvest, L.L.C. v. Corp. Sec. Group, Inc.,* 234 Ga.App. 277, 280, 507 S.E.2d 21, 24-25 (1998) ("Parties may be bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract, or the acceptance by one of the performance by the other") (citations omitted); *Athon v. Direct Merchants Bank,* No. 5:06-cv-1, 2007 WL 1100477, at *4 (M.D.Ga. Apr. 11, 2007) ("[U]nder Georgia law, the parties to an arbitration agreement may

such, neither Plaintiff nor the putative class can state a claim for relief against Global. This matter should be dismissed, or in the alternative, stayed, and compelled to arbitration as more fully described in the Motion to Compel Arbitration contemporaneously filed herewith.

### C. GLOBAL IS <u>EXEMPT</u> FROM APPLICATION OF THE GDAA SINCE IT DOES NOT ENGAGE IN DEBT ADJUSTING AS DEFINED BY THE STATUTE

According the plain language of the GDAA, the activities Global conducts as it relates to this claim and in general fail to bring it within the purview of the statute. Even the most cursory review of the GDAA demonstrates that Global engaged in lawful conduct rather than the unlawful misconduct Plaintiff is asking the court to infer. Consequently, there are two separate reasons that Global is exempt and why Plaintiff's claims fail, as discussed next.

#### 1. The GDAA does not apply to entities regulated by the FDIC, OTS or the OCC.

The "Exemptions" section of the GDAA, O.C.G.A. § 18-5-3, provides in pertinent part that:

> ... Nothing in this chapter shall apply to those persons or entities who ***incidentally engage*** *in debt adjustment* to adjust the indebtedness owed to said person or entity. Nothing in this chapter shall apply to the following entities or their subsidiaries: … a bank, bank holding company, trust company, savings and loan association, credit union, credit card bank, or savings bank that is regulated and supervised by the *Office of the Comptroller of the Currency*, the *Office of Thrift Supervision*, the Federal Reserve, the *Federal Deposit Insurance Corporation*, the National Credit Union Administration, or the Georgia Department of Banking and Finance … (emphasis added).

---

demonstrate their assent to be bound by the agreement by acting upon or accepting benefits under the contract containing the arbitration agreement").

O.C.G.A. § 18-5-3 explicitly exempts entities regulated by any of the agencies listed in the statute from the GDAA.  Global is subject to the review and oversight of the FDIC, OTS and the OCC.[64]

Furthermore, as a third-party processor for various banks, Global effects ACH transactions, a service which banks traditionally performed themselves.[65] More recently, banks have begun using third-party processors to provide the services to account holders.[66]  Indeed, both the Account Application and the Account Agreement between Plaintiff and Global clearly explain that Global is acting as processing agent for the bank holding Plaintiff's Account. Global, by agreement with Plaintiff, facilitates ACH drafting of funds from Plaintiff's primary bank account into her account at RMBT. As such, regulators explicitly identified in the statute, including the FDIC, OTS and OCC regulate Global and the banking functions it performs.[67]

Accordingly, as an agent of RMBT and since it is regulated by the FDIC, OTS and OCC, this provision of O.C.G.A. § 18-5-3 exempts Global from the GDAA.

### 2. Global does not engage in "debt adjusting" nor is it "doing business" in debt adjusting as defined by the GDAA.

O.C.G.A. § 18-5-1 provides in pertinent part that:

> (1)"Debt adjusting" means doing business in debt adjustments, budget counseling, debt management, or debt pooling service or holding oneself out, by words of similar import, as providing services to debtors in the management of their debts *and* contracting with a debtor for a fee to:
>
>> (A) *Effect the adjustment*, compromise, or discharge of any account, note, or other indebtedness of the debtor; or

---

64.     *See* Hampton Dec. at ¶ 10.
65.     *See* Hampton Dec. at ¶ 7.
66.     *See* Hampton Dec. at ¶¶ 7 & 8.
67.     *See* Hampton Dec. at ¶ 10.

> (B) *Receive* from the debtor and *disburse* to his or her creditors any money or other thing of value.

(Emphasis added). So, an entity is involved in debt adjusting under the statutory definition only where it satisfies § 18-5-1(1), *i.e.,* the entity is "doing business" in one of these five ways: (i) debt adjustments; (ii) budget counseling; (iii) debt management; (iv) debt pooling service; (v) management of debts; <u>or</u> the entity is holding itself out as providing services to debtors in the management of their debts. If an entity is doing either of the foregoing under § 18-5-1(1), then to be engaged in debt adjusting the entity still must be "doing business" as described in (1)(A) or (1)(B) of § 18-5-1, *i.e.,* (a) <u>effecting</u> the adjustment, compromise or discharge of indebtedness; <u>or</u> (b) <u>receiving</u> from and <u>disbursing</u> anything of value to creditors. As discussed next, Global does not engage in "debt adjusting" as defined in the statute, thus, Plaintiff cannot state a plausible claim.

### a. <u>Plaintiff does not allege that Global is doing business in any one of the five ways constituting "Debt Adjusting"</u>

Plaintiff here does not, because she cannot, allege that Global was "doing business" in any one of the five statutorily ways defined in § 18-5-1(1). Indeed, Plaintiff fails to assert which, if any, of these five actions Global purportedly performed. Rather, Plaintiff impermissibly attributes the generically alleged statutory wrong-doing to all the "Defendants" in each of her respective claims.[68] That type of pleading fails to set forth a plausible claim against Global in particular. Indeed, "[i]n a case with multiple defendants, the complaint should contain specific allegations with respect to each defendant; generalized allegations "lumping multiple defendants together are insufficient."[69] As alleged, Plaintiff fails to assert sufficient and specific facts as to

---

68.    *See* [Doc. 1-3 ¶¶ 5-12, 71, 72, 78, 80, 93-94, 96-99, 105-108, 109, 115-117 & 119.].
69.    *West Coast Roofing*, 287 Fed.Appx. at 86.

whether Global individually provided any of the five enumerated debt adjusting functions and, so, Plaintiff does not allege a plausible claim against Global herein.

Under *Twombly* and *Iqbal*, Plaintiff must allege more than conclusions that show how this Defendant, Global, as opposed to the other defendants, violated the statute. Plaintiff must, but did not, allege something beyond mere speculation; beyond a bare assertion that servicing a bank account falls within the statutory definition of "debt adjusting." Plaintiff's generic conclusion about "Defendants," which are masquerading as factual allegations are precisely what the Supreme Court said will not state a plausible claim.[70]

### b. Plaintiff does not allege that Global is doing business either "Effecting the Adjustment" or "Disbursement of Funds"

As for the second required portion of the statutory definition of "doing business" in "debt adjusting" as described in (1)(A) or (1)(B) of § 18-5-1, Plaintiff fails to allege facts which support that Global's actions falls within the GDAA.  Specifically, Plaintiff simply does not allege that Global held itself out as providing services to debtors in the management of their debts *and* that it either effected the adjustment, compromise or discharge of Plaintiff's indebtedness or received from and disbursed anything of value to Plaintiff's creditors.  Matter of fact Plaintiff alleges nothing about how Global supposedly effected the adjustment of her debt or disbursed funds to creditors. The reason is plain: the Account Agreement makes clear that Global is simply a processing agent for Plaintiff's account. The Account Agreement makes clear that Global is not a party to Plaintiff's debt management plan, and she acknowledged that Global has no involvement in or responsibilities of any nature with respect to her debt settlement plan or the results that she may or may not achieve from its execution. Global plainly does not negotiate,

---

70.     *Twombly,* 127 S.Ct. at 1949.

authorize or determine when to settle Plaintiff's debts.[71] No allegation in the Complaint supports this idea either nor is such a position plausible in the first place; especially in light of the terms of both the Account Application and Account Agreement, and the duties Global contractually undertook to perform for Plaintiff.

Also, Plaintiff did not allege nor is it plausible that Global "disbursed" anything of value to Plaintiff's creditors. Only through an over-simplistic and perfunctory reading of the statute does Global "disburse" funds. As stated in the Account Application, Global did not have the authority to determine when or which creditors were to receive Plaintiff's funds.[72] In every instance, Plaintiff authorized each such transfer.

Because Plaintiff is pleading pure conclusions, she purposefully ignores the actual language in her Account Application. This application actually provides this Court with an "obvious alternative explanation", which suggests lawful conduct rather than the unlawful misconduct the Plaintiff asks the court to infer here;[73] that Global did nothing more than process bank transactions at the direction of Plaintiff for her debt settlement plan and these activities do not amount to "debt adjusting" as defined by the GDAA.

Moreover, the FTC's Final Rule, which amended the Telemarketing Sales Rule ("TSR"), thoroughly details the activities conducted by "debt relief companies" and Global simply does not fall within this definition either. The Final Rule imposes a federal scheme of regulation upon "debt relief companies" providing "debt relief services", which are defined as:

---

71.    *See* Hampton Dec. at ¶ 9.

72.    *See* Hampton Dec. at Ex. 1 (The Account Application, which Plaintiff signed, plainly states: "In disbursing funds with respect to the Program, Bank and GCS may rely on my instructions to the Sponsor unless and until I give Bank and GCS a written notice to the contrary... I understand that the Account, when established in accordance with this Application, will be my sole and exclusive property: that only I may authorize deposits to and disbursements from the Account…").

73.    *See Twombly*, 127 S.Ct. at 1972-74.

> any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.[74]

According to this definition, it is quite clear that Plaintiff does not and cannot allege facts which would support that Global provides "debt relief services".

The Final Rule makes clear that a bank processing agent such as Global, which simply provides account and attendant ACH and like services, is ***not*** considered a "debt relief company".[75] By distinguishing a "debt relief company" (a "debt adjuster" in Georgia) and an "intermediary" company, such as Global, the FTC recognized the distinction between a "debt adjuster" and other entities that establish and maintain "dedicated bank accounts" for customers which are legitimately utilized by the debt relief company for deposit and holding of both its fees and the monies to be eventually paid to the customer's creditors.[76]

The Final Rule certainly proves instructive in supporting Global's position that it is not "doing business" in "debt adjusting" and that its activities with respect to this claim do not fall within the guise of the GDAA.

---

74.    16 CFR § 310.2(m).

75.    A provision in the Final Rule allows debt relief companies to require that consumers set aside their fees and savings for payment to creditors in a "dedicated account" – such as the RMBT "Special Purpose Account", which Global administered here – when (i) the dedicated account is maintained at an insured financial institution; (ii) the consumer owns the funds (including any interest accrued); (iii) the consumer can withdraw the funds at any time without penalty; (iv) the provider does not own or control or have any affiliation with the company administering the account; and (v) the provider does not exchange any referral fees with the company administering the account, the precise attributes of the account Plaintiff (and each member of the putative class) opened with RMBT and which Global administered. *See Telemarketing Sales Rule Debt Relief Rule Fact Sheet – 7/28/10* at http://www.ftc.gov/os/2010/07/100729tsrfactsheet.pdf

76.    16 CFR § 310.4(a)(5)(ii).

c. **Plaintiff does not even attempt to allege that Global is more than incidentally engaged in debt adjustment**.

The GDAA states that "nothing in this chapter shall apply to those persons or entities who ***incidentally engage*** *in debt adjustment* to adjust the indebtedness owed to said person or entity."[77] Plaintiff's lumping of all Defendants together to assert generalized allegations of debt adjusting, however, does not establish a plausible basis upon which to rest a claim against Global.

Plaintiff's Account Application and Account Agreement established the limits of Global's activities:  Global merely acted as RMBT's bank processing agent to facilitate ACH drafting of funds from Plaintiff's primary bank account into her Account at RMBT. Consequently, at no point does Plaintiff allege that Global contacted or otherwise negotiated Plaintiff's debts with her creditors; or that Global assisted in developing or managing her debt settlement program, indeed, her Account Agreement states otherwise. Moreover, Plaintiff does not allege that Global determined what fees the debt settlement companies charged her, or how these payment plans were structured; and, Plaintiff does not, because she cannot, allege that Global had the authority to determine when the funds in her account were to be transferred from her personal account to her creditors. The Account Agreement specifically disclaims these activities.[78]

---

77.     O.C.G.A. § 18-5-3; (emphasis added).
78.     *See* Hampton Dec. at Ex. 2 (The Account Agreement plainly states: "You agree to settle all disputes about payments made to your creditors from your Account. We are simply providing your Account to help facilitate your plan to repay your debts. We are not a party to your debt management plan, and you acknowledge that we have no involvement in or responsibilities of any nature with respect to your plan or the results that you may or may not achieve from its execution.").

Simply put, on the facts alleged against all Defendants, Plaintiff has not shown a plausible basis to conclude that Global's participation in this matter even qualifies as "incidentally engag[ing] in debt adjustment;" nonetheless, even if the allegations were present, however, Global's services described completely in the Account Agreement fall within this express exemption and provides an "obvious alternative explanation" under *Twombly*.

### D. EVEN IF GLOBAL IS NOT EXEMPT FROM THE GDAA, PLAINTIFF FAILS TO ALLEGE PLAUSIBLE CLAIMS AGAINST GLOBAL UNDER ANY THEORY

Should the Court determine that Global is not exempt from the GDAA's application, Plaintiff fails to allege plausible claims under O.C.G.A. § 18-5-2 (Count I), § 18-5-3.2(a) (Count II) or § 18-5-3.2(b) (Count III).

#### 1. Count I fails to allege facts which state a plausible claim that Global collected an impermissible fee.

O.C.G.A. § 18-5-2, provides in pertinent part that:

> In the course of engaging in debt adjusting, it shall be unlawful for ***any person*** to accept from a debtor who resides in this state, either directly or indirectly, any charge, fee, contribution, or combination thereof in an amount in excess of 7.5 percent of the amount paid monthly by such debtor to such person for distribution to creditors of such debtor….

(Emphasis added). As the statute reads, in order for Plaintiff to state a plausible claim against Global, Plaintiff must allege facts to support that Global alone, as the term "person" is singular, charged Plaintiff fees which exceeded 7.5% of the monthly monies received from Plaintiff for distribution to her creditors.[79]   However, nowhere in her Complaint does Plaintiff allege facts

---

[79]   While Global in no way admits it is subject to the GDAA, the foregoing sections will address these baseless claims only for the purposes of dismissing the suit.

which support such a conclusion as it relates to Global.[80] The one-size-fits-all use of the term "Defendants" in alleging "they" collected fees in excess of the statutory mandate, alone, cannot and does not state a plausible action against Global.

Any fees charged by Global must be alleged and thereafter analyzed independently from those charged by the Debt Settlement Defendants. Yet, as alleged, nothing is said about Global's fees. It is evident from what is alleged that the nominal fees charged by Global were certainly not for "debt adjusting" as defined by the statute.  All it takes is a cursory review of the Fee Schedule attached to the Complaint as Exhibit "C" to determine this fact.[81] The Supreme Court made clear in *Twombly* that a district court is free to infer from the factual content in the complaint "obvious alternative explanations," which suggests lawful conduct rather than the unlawful misconduct the plaintiff would ask the court to infer.[82] Thus, no allegations in the Complaint addressed how Global, alone, charged excessive fees, but the Account Agreement and the Fee Schedule demonstrate an obvious alternative explanation, which shows why there is no plausible claim against Global.

> **2.   Count II fails to allege facts which state a plausible claim that Global did anything more than disburse funds at Plaintiff's direction.**

O.C.G.A. § 18-5-3.2(a), provides that:

> Any person engaged in debt adjusting shall disburse to the appropriate creditors all funds received from a debtor, less any fees authorized by this chapter, within 30 days of receipt of such funds.

---

80.    "In a case with multiple defendants, the complaint should contain specific allegations with respect to each defendant; generalized allegations lumping multiple defendants together are insufficient." *West Coast Roofing*, 287 Fed.Appx. at 86.
81.    [Doc. 1-3, Ex. C.].
82.    *Twombly*, 127 S.Ct. at 1972-74 (The Court found that plaintiffs' complaint did not plausibly suggest an illegal conspiracy by merely alleging parallel conduct-because such parallel conduct was more likely explained by lawful, independent market behavior and so the Court held that the district court properly dismissed the complaint.).

Once again, Plaintiff imprecisely and incorrectly lumps all "Defendants" together in her conclusory allegations of this Count. Without alleging supporting facts relating to Global's activities in particular here, Plaintiff simply paraphrases the statute in order to reach another pure legal conclusion about all Defendants. Again, *Twombly* makes patently clear that "a formulaic recitation of the elements of a cause of action will not do."[83]  A complaint must contain "enough factual matter (taken as true) to suggest" the required element as to each particular defendant, which Plaintiff's complaint fails to do.[84]

As discussed above, the FTC's Final Rule makes clear that a bank processing agent such as Global, which simply provides account and attendant ACH and like services and none of the "debt relief services" the Final Rule defines, is ***not*** considered a "debt relief company".[85] The Final Rule acknowledges the obvious distinction between a "debt relief company" (a "debt adjuster" in Georgia), and an "intermediary" company, such as Global and the banks for which it acts as an agent, that establishes and maintains a "dedicated bank account" for the customer which is legitimately utilized by the debt relief company for deposit and holding of both its fees and the monies to be eventually paid to the customer's creditors.[86] In this regard, because Global is not a debt relief company and because it is not collecting a fee for that purpose, the nominal amount it does charge for account services does not run afoul of the GDAA.

### 3. Count III fails to allege facts which state a plausible claim against Global, which serviced Plaintiff's bank account at her direction.

Plaintiff fails to allege facts sufficient to state a plausible claim against Global here.

O.C.G.A. § 18-5-3.2(b), provides that:

---

83.     *Twombly,* 127 S.Ct. at 1964-65.
84.     *Twombly,* 127 S.Ct. at 1965.
85.     *See Telemarketing Sales Rule Debt Relief Rule Fact Sheet – 7/28/10* at http://www.ftc.gov/os/2010/07/100729tsrfactsheet.pdf
86.     16 CFR § 310.4(a)(5)(ii).

> Any person engaged in debt adjusting shall maintain a separate
> trust account for the receipt of any and all funds from debtors and
> the disbursement of such funds on behalf of debtors.

In this Count, Plaintiff globally alleges that all "Defendants" required Plaintiff, through the "Contract", to set up and maintain an escrow/trust account for the accrual of the debt settlement funds.[87] The FTC's Final Rule, however both codifies and legitimizes a practice of the debt relief industry that is assailed in this case: the collection of monies (and fees) in advance which are held in the special purpose account until the debt relief company has negotiated the settlement of an account, but those fees by definition do not include bank account processing fees where the banking activity is based on a contractual agreement and permissible. The mechanics for this "dedicated bank account" are plainly set out in 16 CFR § 310.4(a)(5)(ii) and make clear that any fee Global charge is separate and apart from the fees about which Plaintiff seems to complaint. Thus, the FTC has explicitly recognized that an intermediary such as Global is not and cannot be a debt relief company.

## E.  IF THE GDAA APPLIES TO GLOBAL'S CONDUCT, THEN THE STATUTE IS UNCONSTITUTIONAL

The GDAA's provisions Plaintiff alleges and seeks to have interpreted and applied to establish Global was "doing business" in "debt adjusting" and charged illegal fees, among other alleged violations, under the GDAA is unconstitutional if so applied and thereby would violate the United States Constitution, Article I, section 10, clause 1 (the "Contract Clause"), Article 1, section 8, clause 3 (the "Commerce Clause") and the Equal Protection and Due Process provisions of the Fifth and Fourteenth Amendments, and provisions of the State Constitution.

---

87.     [Doc. 1-3 ¶ 115.].

### 1. If applied as Plaintiff urges, than the statute impairs the obligation of contracts.

The U.S. Constitution provides that: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."[88] Whether a regulation violates the Contract Clause is governed by a three-step inquiry: "The threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'"[89]

On the facts alleged and as reflected in the Account Application and Account Agreement, RMBT, at Plaintiff's request, opened and maintained a transaction account through its disclosed agent "processor" Global. Plaintiff was free to make deposits, withdrawals, and payment orders to third persons relating to their bank account, which is a traditional banking function and relationship for which Global was entitled to a fee. To the extent the GDAA makes the Account Agreement null and void, or deems Global's activities violative of multiple provisions of the statute, on this or other grounds, and turns a simple contractual banking relationship into something else, then the statute impairs the constitutionally protected obligations of contract.

---

88. United States Const. art. I, § 10, cl. 1. Although the text of the Contract Clause is "facially absolute," the Supreme Court has long held that "its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 78 L.Ed. 413 (1934)).

89. *Id.* at 411, 54 S.Ct. 231 (*quoting Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)). If this threshold inquiry is met, the next step for the court is to inquire whether "the State, in justification, [has] a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem," to guarantee that "the State is exercising its police power, rather than providing a benefit to special interests." *Id.* at 411-12, 54 S.Ct. 231 (citation omitted). Finally, the third step for the court is to ask "whether the adjustment of 'the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption'." *Id.* at 412-13, 54 S.Ct. 231 (*quoting United States Trust Co. v. New Jersey*, 431 U.S. 1, 22, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)).

> 2. **Likewise, if so applied the statute directly regulates or discriminates against interstate commerce or places an excessive burden on interstate commerce in relation to any putative local benefits**.

The Constitution's Commerce Clause gives Congress the power "[t]o regulate commerce . . . among the several States."[90] "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate . . . commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce."[91]

The Supreme Court has adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, the Court has generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, the Court has examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.[92]

The first-tier inquiry turns on whether the challenged law "affirmatively or clearly discriminates against interstate commerce on its face or in practical effect."[93] Discriminatory

---

90. United States Const. art. I, § 8, cl. 3.

91. -*Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). Courts speak of the source of this limitation on state law as the dormant Commerce Clause. *See Dep't of Revenue of Ky. v. Davis*, 128 S.Ct. 1801, 1808, 170 L.Ed.2d 685 (2008)(The Supreme Court's jurisprudence under the dormant Commerce Clause "is driven by concern about economic protectionism--that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. The point is to effectuate the Framers' purpose to prevent a State from retreating into economic . . . isolation.").

92. *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (citations omitted).

93. *C & A Carbone, Inc. v. Town of Clarkstown, N. Y.*, 511 U.S. 383, 402, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (internal quotation marks omitted).

laws are those that "mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."[94] A statute may be neutral in its terms and still discriminate against interstate commerce.[95] If the challenged law does not discriminate, the challenger must rely on a second-tier inquiry, which employs the balancing test of *Pike v. Bruce Church, Inc.*[96]

As discussed above, applying the statute as Plaintiff urges has the practical effect of discriminating under the first-tiered analysis against out-of-state companies engaged in traditional bank processing transactions and excessively burdening interstate commerce with its extra-territorial reach.

## IV.   <u>CONCLUSION</u>

Based on the foregoing, Plaintiff and her putative class action, based on alleged violations of Georgia's Debt Adjusting statute, fail to state plausible claims for relief here and they must be dismissed herein.

---

94.     *Granholm v. Heald*, 544 U.S. 460, 472, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) (internal quotation marks omitted).

95.     *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 350- 52, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (facially neutral North Carolina statute discriminated against interstate commerce by raising Washington growers' costs of doing business in the state and stripping away the competitive advantage of the Washington grading system).

96.     397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). That test states that "[the law] will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142.

Respectfully,

Dated: December 6, 2010.

GREENSPOON MARDER, P.A.


/s/ Richard W. Epstein
RICHARD W. EPSTEIN
Florida Bar No. 229091
Richard.Epstein@gmlaw.com
REBECCA F. BRATTER
Florida Bar No. 0685100
Rebecca.Bratter@gmlaw.com
*Attorneys for Global Client Solutions, LLC*
100 West Cypress Creek Rd., Suite 100
Ft. Lauderdale, FL 33309
Telephone: (954) 491-1120
Facsimile:  (954) 771-9264

WEINSTOCK & SCAVO, P.C.
CHARLES J. BOWEN
Georgia Bar No. 071115
cbowen@wmlaw.net
*Attorneys for Global Client Solutions, LLC*
7 East Congress St.
Savannah, GA 31401
Telephone: (912) 944-1675
Facsimile:  (912) 495-0166


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by ECF notice or U.S. mail to the persons indicated on this 6th day of December, 2010.

s/ Richard W. Epstein